1
2
3
4
5
6                 IN THE UNITED STATES DISTRICT COURT

7              FOR THE NORTHERN DISTRICT OF CALIFORNIA

8
9   ALVIN SMART,                        No. C 09-3127 CW (PR)

10              Petitioner,

11        v.                            ORDER DENYING PETITION FOR WRIT
                                        OF HABEAS CORPUS; DENYING
12   KELLY HARRINGTON, Warden,          CERTIFICATE OF APPEALABILITY

13              Respondent.

14   _____/

15
16                           INTRODUCTION

17       Petitioner Alvin Smart, a prisoner of the State of California

18  who is currently incarcerated at Sierra Conservation Center in

19  Jamestown, California, seeks a writ of habeas corpus pursuant to 28

20  U.S.C. § 2254.  Petitioner filed his Petition on July 10, 2009.  On

21  February 24, 2010, the Court issued an Order to Show Cause why the

22  writ should not be granted and on July 23, 2010, Respondent filed an

23  Answer.  Petitioner filed a Traverse on November 10, 2010.

24       For the following reasons, and having considered all of the

25  papers filed by the parties, the Court DENIES the Petition.

26                         PROCEDURAL HISTORY

27       Petitioner was convicted of three counts of indecent exposure

28  with a prior conviction for the same offense.  The state court

1   procedural history, which is relevant to Petitioner's habeas

2   petition, was summarized by the state court as follows.

3          On April 21, 1998, an information was filed charging
       Smart with three counts of indecent exposure and one count
4      of falsely identifying himself to authorities.  Smart was
       also charged with three prior strikes (§ 1170.12) and two
5      prior prison term enhancements (§ 667.5, subd. (b)).

6          On January 25, 1999, the superior court suspended
       proceedings pursuant to section 1367.  A competency
7      examination was conducted and, on August 24, 1999, the
       court made a finding that Smart was not competent to stand
8      trial.  Smart was committed to the State Department of
       Mental Health for placement at Atascadero State Hospital
9      on September 15, 1999.

10         An order filed March 21, 2001, directed that Smart be
       returned to court from the State Hospital.  Certification
11     proceedings commenced on March 27, 2001, and, on April 12,
       2001, Smart entered a plea of not guilty by reason of
12     insanity.  A competency trial was held on September 6,
       2001, at the conclusion of which the court found that
13     Smart was competent to stand trial and ordered that
       criminal proceedings were reinstated.
14
           On February 4, 2002, the date set for commencement of
15     a jury trial, criminal proceedings were suspended again
       pursuant to section 1367.  On February 26, 2002, the court
16     conducted another competency examination at the conclusion
       of which it found that Smart was not presently competent
17     to stand trial.  On April 4, 2002, Smart was committed to
       the Department of Mental Health for placement at Napa
18     State Hospital.

19         On April 11, 2003, Smart was returned to court for
       proceedings to certify that he was competent to stand
20     trial.  Another competency examination was conducted on
       June 10, 2003, at the conclusion of which the court made a
21     determination that Smart was presently competent to stand
       trial.
22
           In July and August of 2003, Smart filed a series of
23     pro per motions pursuant to which he complained about such
       matters as ineffective assistance of counsel, being forced
24     to take "drugs," and having to remain in the same unit of
       the State Hospital where the doctors found he was
25     competent.  During this period Smart also made pro per
       requests for a new competency hearing, substitute
26     appointed counsel and a new preliminary hearing.  On
       September 5, 2003, Smart filed a pro per petition for a
27

28                                    2

writ of habeas corpus seeking dismissal of charges and the institution of civil commitment proceedings on the ground that the period during which he had been detained as incompetent exceeded the maximum term or commitment authorized by section 1370, subdivision (c)(1) (section 1370(c)(1)).  That petition was denied on September 16, 2003.

Trial commenced before the Honorable Stephen Hall on October 20, 2003.  Smart's defense of not guilty by reason of insanity was bifurcated and the presentation of evidence in the guilt phase commenced on October 24, 2003.  The jury began deliberating on October 28, and returned a verdict of guilty as to all charges that same day.  The jury returned "true" verdicts as to the prior convictions of November 4 of that year.  The jury was dismissed and the sanity phase of the trial was continued after the court decided that neither side was prepared to proceed.

The sanity phase of the trial was continued several times for reasons which did not relate to Smart's competency.  On April 22, 2005, Smart filed a motion for substitute appointed counsel pursuant to <u>People v. Marsden</u> (1970) 2 Cal. 3d 118 (<u>Marsden</u>) and on April 26, he filed a motion to represent himself pursuant to <u>Faretta v. California</u> (1975) 422 U.S. 806 (<u>Faretta</u>).  Both motions were heard and denied on May 4, 2005, by the Honorable John L. Grandsaert.

The sanity phase of the trial commenced before Judge Hall on January 17, 2006.  That day, Smart made a motion for a hearing to determine whether he was competent to proceed with the trial, which was denied.  The presentation of evidence began on January 23, 2006.  On January 26, 2006, after deliberating for less than one and one-half hours, the jury returned its verdict that Smart was sane when he committed the offenses.  On February 24, 2006, the court denied Smart's new trial motion, refused to dismiss his prior strikes and sentenced him to a total term of 75 years to life in prison.

<u>People v. Smart</u>, pp. 2-4, Nos. A113111, A119279, Court of Appeal of the State of California, First Appellate District, (filed by Respondent as Ex. B-3 and hereinafter, Opinion).

Petitioner appealed, and on February 15, 2008, the California Court of Appeal affirmed the judgment in an unpublished order and denied Petitioner a writ of habeas corpus.  The California Supreme

3

1  Court denied review of Petitioner's direct and collateral appeals.

2                        STATEMENT OF FACTS

3       The California Court of Appeal summarized the factual

4  background of this case as follows:

5

6       A. Guilt Evidence

7          1. The Charged Offenses

8          On December 17, 1996, at approximately 6:15 a.m., Nancy
   Pangilinan went to the underground garage of her Millbrae
9  condominium complex. She was unlocking her car when
   she heard a noise in the empty stall next to her parking
10 space. Pangilinan looked over and saw a nude man
   masturbating. The man was approximately two feet from her
11 car. His face was covered by a red scarf and he was
   "crouching down like a catcher." The man's genitals were
12 "completely shaven," and he was "stroking" his penis which
   was "shiny, like he was lubricated."

13         Pangilinan was frightened by the man and tried to get
   in her car and drive away but she was so nervous that the
14 car "jumped" as she put it into gear. The man walked in
   front of the car and approached her driver's side window
15 while he continued to masturbate. Pangilinan almost hit
   the man as she drove away.
16
           On October 12, 1997, at around 2:00 a.m., Katrina
17 Stanley was in her ground floor Burlingame apartment
   reading a magazine and waiting for her husband to come
18 home. She noticed a man outside standing about a foot away
   from her window. She went to the window and saw that the
19 man's pants were down around his ankles and that something
   like a shirt was covering the top of his head. The man's
20 crotch area was completely shaved and his hand was on his
   shiny, fully erect penis which appeared to have some "sort
21 of lubricant on it." He was masturbating with one hand as
   he motioned with the other for Stanley to come outside.
22 The man stayed outside while Stanley called 911 but fled
   once she hung up the phone.
23
           On the morning of October 12, 1997, Nancy Pangilinan,
24 the woman who had found a man masturbating in her garage
   the previous December, was preparing to take a vacation.
25 Nancy and her husband Joel went to their garage at around
   7:30 a.m. because Nancy wanted to make sure the car was
26 properly parked while they were away.

27

28                                4

Nancy was re-parking the car when she heard Joel shout, "what the hell are you doing here?" Through her side mirror, Nancy saw the same man who had accosted her in December of 1996. He was nude, crouched down and his face was covered with a red scarf. The man apologized and said he was "going to the bathroom." Nancy said: "I have seen you before, you were behind my other car in this garage." The man repeatedly said, "I am sorry, leave me alone, I will get out of here, I am going to the bathroom, leave me alone."

Although he claimed to be going to the bathroom, Nancy did not observe the man relieving himself. Nor did she observe any urine or feces in the spot where he had been crouching after he walked away. As he walked away from Nancy, the man kept his face covered with the red shirt but did not attempt to cover his genitals which were completely shaven. The man's penis, though not erect, was shiny and appeared to have been lubricated.

Nancy's husband Joel followed the man as he retrieved his clothes from behind a car parked several stalls away from where Joel and Nancy had first seen him. The man, who had put his pants on and no longer covered his face, turned toward Joel who got a "good look at him." Joel followed the man out of the garage where he encountered Jesse Capilitan who was walking his dog. Joel asked Capilitan to call the police. Joel lost sight of the man but Capilitan got in his car and followed the man while he called the police on his cell phone. The man darted behind a condominium complex into a large grassy field.

    2. Police Investigation

When the police arrived at the Pangilinan's residence, Jesse Capilitan directed them toward the field where an officer found appellant, Alvin Smart. Smart was "lying underneath a large amount of brush and leaves holding still as if trying to avoid" detection. Smart's hands were "greasy" and "shiny" looking. He falsely reported that his name was Robert Thomas Payne. From close by, officers retrieved a jar of Vaseline and a red T-shirt. FN2.

Katrina Stanley was brought to the scene and identified Smart as the man who was outside her window the previous evening. She recognized his shoes, pants and the T-shirt he was wearing. At trial, Stanley testified that she may also have recognized a tattoo on his arm.

After his arrest, Smart was taken to the Burlingame police station where he was interviewed by Officer James Hutchings. Hutchings told Smart that a woman had reported

5

seeking a man the previous evening, standing outside her
window and masturbating. Smart acknowledged he knew what
masturbating was, but denied any knowledge about the
incident and said that he could not "even get an erection
anyway" because of prostate problems. Smart also said the
woman could not accuse him of anything because he "never
did nothing like that." Hutchings told Smart that another
woman saw a man pull his pants down outside her apartment
which was close by the place where Smart was arrested.
Smart stated that the only time his pants were down was
when he was "taking a crap" in the field where police
found him. Smart repeatedly stated that he did not pull
his pants down in front of women and that he made sure he
was hidden from view when he went to the bathroom. Smart
also told the officer that he had never been arrested
before.

A short time after Hutchings completed his interview,
Millbrae police officer Richard Dixon interviewed Smart.
Dixon asked whether Smart had exposed himself to a female.
Smart again denied that he had done anything. Smart also
denied ownership of the jar of Vaseline and the red
T-Shirt. He denied that the greasy substance on his hands
was Vaseline and said he just had oily skin. Smart told
the officer that his genitals were shaved because he had
"crabs." Smart also said he had "absolutely not" been
incarcerated in the past, that he had not been running
from anybody and that he was sleeping in the woods and was
just "a victim of circumstances."

    3. Uncharged Incident

Late on the evening of November 8, 1983, Trudie
Mitchang heard a knock and went to the front door of her
ground floor apartment in Pacifica. Seeing nothing through
the peephole, Mitchang started to return to her bedroom
when she heard another knock and realized it was coming
from the kitchen window. She saw a man outside the window
who was wearing something over his face that resembled a
ski mask, with holes for the eyes cut out. The man's pants
were unzipped and he was stroking his exposed penis which
was "slick, shiny or oily looking." Mitchang screamed to
her roommate and called 911.

A San Mateo police officer who responded to Mitchang's
911 call apprehended Smart who was found sitting on a
motorcycle, with his pants falling down and his buttocks
exposed. A T-shirt with eye holes cut into it was in
Smart's pocket. Smart also had a jar of Vaseline in his
pants pocket. There was Vaseline on his hands and the
crotch area of his pants.

6

An officer walked Mitchang to the location where Smart
was apprehended, only a short distance from her home.
Mitchang identified Smart as her assailant, although she
could not be absolutely sure because his face had been
covered. Mitchang said that the clothes Smart was wearing
and his general appearance "matched exactly."

B. Sanity Evidence

    1. The Defense Case

    To support his claim that he was insane when the
charged offenses were committed, Smart presented testimony
by two expert witnesses, Dr. Robert Slater and Dr. Paul
Berg.

        a. Dr. Robert Slater

    Dr. Slater is a board certified psychiatrist who
testified on behalf of the defense as an expert in the
field of psychiatry. Slater interviewed Smart three times
between April 2001 and November 2003, the first two times
pursuant to court orders.

    Slater interviewed Smart on April 30, 2001, as part of
a court ordered psychiatric evaluation to determine if
Smart should be found not guilty by reason of insanity. At
the time, Smart was disheveled, poorly groomed, and he
rocked back and forth, muttered, giggled and was generally
incoherent throughout the evaluation. In a May 3, 2001,
report to the court, Slater diagnosed Smart as suffering
from chronic schizophrenia. Slater based his diagnosis on
Smart's medical records which reflected he had been
diagnosed as schizophrenic in the past and on Smart's
"presentation." However, Slater also determined that Smart
was sane when the offenses were committed. Although Smart
was too incoherent in April 2001 to respond to questions
about the incidents, the police reports from that time
period indicated that Smart was sane when the crimes were
committed, that he knew what he had done and that what he
had done was wrong.

    Slater interviewed Smart again on February 15, 2002,
pursuant to a court order for a determination whether
Smart was competent to stand trial. Smart was responsive,
more alert and made good eye contact, but he was not
coherent and engaged in "almost non-stop psychotic
ramblings."  When Slater interviewed Smart in 2002, he was
aware that Smart had previously been identified as a
malingerer. However, Slater concluded that "[t]he content
of his psychotic rambling was very consistent with a
genuinely mentally ill person, rather than a sane person

trying to fake insanity." Therefore, Slater concluded that
Smart was not competent to stand trial in February 2002.

Slater interviewed Smart a third time on November 12,
2003, in order to reconsider his prior conclusion that
Smart was sane at the time the offenses were committed.
Smart's psychological condition was "markedly improved."
He was coherent, responsive, and alert, made eye contact
and was able to articulate the charges against him. Smart
reported that he was "pretty much out of it" when he was
arrested, that God was telling him what to do and he had
to obey because he was God's son Jesus, and that
Government people were trying to kill him. Smart said that
he could see the agents inside his body when he looked in
the mirror and that God told him the only way to get rid
of them was to masturbate in front of women to kill the
agents. Smart told Slater that he strongly believed what
the voices told him at the time, that he still gets
confused at times, that he can think more clearly now but
"it still seems real."

Slater testified at trial that he did not believe Smart
was malingering during the November 2003 interview. In
Slater's opinion, a successful malingerer would appear to
be "incoherent all the time," in order to secure a finding
of incompetence and avoid trial altogether. Furthermore,
Slater characterized Smart's reported delusion as a "story
told by a crazy person" and stated that "I don't think
there is any sane person that could think this up that
quickly off the top of his head, even with a rehearsal, it
is too real." Slater testified that Smart "comes across as
a generally psychotic person, even when he is coherent, he
is still psychotic."

When asked for his conclusion as to whether Smart was
sane at the time the offenses were committed, Slater
testified that "I concluded he was legally insane, on the
basis of the history that he gave to me."

b. Dr. Paul Berg

Dr. Paul Berg is a psychologist, licensed in California
since 1967, who testified as an expert in the field of
psychology. Berg was retained by the defense to review
Smart's medical records and evaluate him in order to
determine whether he was sane at the time the offenses
were committed. Berg interviewed Smart on July 22, 2004,
and also administered a Mellon Clinical Multi-Axial
Inventory (MCMI) test, the purpose of which was to obtain
a long-term perspective on the patient's mental health
status.

8

1    During the interview, Smart explained to Berg that
2 exposing himself to women was "the only way he could free
  himself from the government agents that had entered his
3 body." By masturbating in front of women, Smart was able
  to release "the holy liquid" and "cleanse him[self] and
4 rid him[self] of this poisonous presence in his body."
  Berg's clinical impression of Smart was that he suffered
5 from a delusional disorder and that he was a
  schizophrenic.

6    Berg offered the opinion at trial that Smart was
7 psychotic when Berg interviewed him and was legally insane
  when the offenses were committed. Berg acknowledged that,
8 in the past, Smart had been variously diagnosed as a
  schizophrenic and as a malingerer. In Berg's opinion,
9 these two diagnoses were not inconsistent. Furthermore,
  Berg believed that the results of the MCMI test
10 reinforced his impression that Smart "was not trying to
  fake" mental illness.

11        2. The Prosecution Case

12            a. Lay witnesses

13    The People presented testimony from several witnesses
14 who observed Smart's behavior and demeanor during relevant
  time periods including Mark Stockton, Smart's former
15 parole agent. Stockton testified he saw Smart at least
  four times a month from December 1995 until his October
16 1997 arrest, except for periods when Smart was
  incarcerated for parole violations. Smart never exhibited
17 any delusional thinking during parole visits. He acted
  "appropriate[ly]," and he knew "what was going on."

18    Police officers Hutchings and Dixon both testified
19 regarding Smart's behavior on the day of his arrest.
  Hutchings testified that Smart was cooperative, acted
20 appropriately and did not do anything to suggest he was
  delusional or crazy. Officer Dixon testified that Smart
21 did not express any delusions or make any bizarre
  statements to him. Throughout the arrest and interview
22 process, Dixon did not see any sign that Smart was having
  any mental problems.  FN3.

23    Ruthann Flament, a nurse practitioner at the Maguire
24 Correctional Facility at the San Mateo County jail, had
  observed Smart on several occasions while he was in jail
25 and was also familiar with his medical records at the
  jail. Flament first examined Smart on October 12, 1997,
26 the day he was arrested, after he reported to authorities
  that he suffers from asthma. During the examination, Smart
27 complained of lower back pain due to a car accident. He

28
                              9

did not make any mental health complaints, and did not engage in any bizarre behavior. Flamant saw Smart again on October 24, 1997, to follow up regarding Smart's back pain. Smart was in no acute distress, was pleasant, and talkative and was advised to exercise. Between October 1997 and September 1999, Smart sought medical attention close to fifty times but never for a mental health issue. Flament testified that Smart first came to the attention of mental health staff in February 1999 when a deputy observed Smart engaging in bizarre behavior and requested a mental health evaluation for him.

Stephanie Arthur, the prosecutor at Smart's October 2003 guilt trial, testified that she took careful notes about what occurred in court during each day of trial. On the afternoon of the first day, Smart appeared wearing a green smock-type robe and sitting in a wheelchair. He was "mumbling incoherently and blowing raspberries ... throughout the proceedings." The next morning, Smart again appeared in the robe and wheelchair but was now talking loudly and claimed to be Jesus Christ. He called his attorney derogatory names but was not mumbling and rocking in his chair as he had done the day before. At some point during the morning session, the trial judge informed Smart that the trial would proceed with or without his cooperation. That afternoon, Smart returned to court dressed in street clothes. He stopped the yelling, the rocking and the mumbling. Smart wore a suit to court the next day, the first day of jury selection. During the remainder of the guilt trial, Smart appeared to be communicating well with counsel and was respectful of the proceedings.

b. Dr. Michael Venard

Dr. Michael Venard, a staff psychologist at Napa State Hospital, was subpoenaed by the prosecution to testify regarding an evaluation of Smart that he conducted in March 2001. Venard was not paid for his testimony and was not asked to formulate an opinion regarding Smart's sanity.

Venard testified that, in March 2001, hospital staff at Smart's housing unit determined that Smart "presented" differently depending on who he was talking to and requested an assessment of the authenticity of Smart's mental health symptoms to aid them in formulating an appropriate treatment plan. Venard reviewed legal and medical records dating back to 1971, observed Smart informally on several occasions and conducted an interview with him in March 2001.

10

From his review of Smart's records, Venard learned that Smart had employed several aliases over the years. This fact was significant because it indicated Smart was a sophisticated patient who knew how to protect his identity and present a different identity to medical evaluators. The records also revealed that mental health treatment was never voluntary but always followed some type of legal problem when he was put in jail. Smart's records also suggested that he knew how to control his symptoms so that he could have himself moved from a jail setting to a treatment setting. Whenever Smart was placed in a jail setting, he would "almost immediately begin to decompensate" and would have to be returned to a hospital setting.

In March 2001, Venard visited the unit where Smart was housed several times a week and had the opportunity to informally observe Smart in that environment. Venard observed that Smart was no more or less impaired than other patients who managed their daily affairs, got to their appointments and ran their lives. When Venard told Smart he was a psychologist who was asked to perform an evaluation, Smart's behavior changed. At first Smart made eye contact and spoke clearly. But, as Venard began to question him about his mental health, Smart became less responsive, and more isolated. After the interview was completed, Smart's behavior changed again as he began to interact with patients and staff in a more normal way.

During the March 2001 interview, Venard asked Smart about the charged offenses. Smart claimed to have no memory of them. When Venard asked what other people had told him about the events, Smart became upset and claimed he never wanted to hurt anybody and was not a violent man. He engaged in an "ongoing upset kind of rambling," during which he made the following statement: "It's not fair to lock me up for three years for something that I don't remember. Two doctors already told me I was incompetent, and I should not go to jail." During the interview, Smart never told Venard that he had delusions that required him to masturbate in front of women.

Venard attempted to administer two tests, one designed to help clinicians determine whether a patient is exaggerating, manipulating or making up psychiatric symptoms, and the other used to determine whether a patient is engaging in memory malingering, i.e., whether he is "faking" memory problems. Smart refused to complete both of these tests.

Venard drew several conclusions from his evaluation which he shared at trial. Among other things, Venard found

11

that Smart's overall presentation indicated an
"intentional exaggeration of his symptoms whenever he's
faced with legal consequences for his actions," that he
appeared to be self-sufficient on a daily
basis, and that he was capable of recalling names and
events when he needed that information to support his
claim of impairment. Venard also found that Smart did have
a "true mental illness," but that it was coupled with
exaggeration or even intentional manufacturing of problems
when he was faced with a legal problem. Venard also
testified that "[Smart] seemed fully aware of his own
history. He seem[ed] aware of the potential consequences
of his actions; and, in my opinion, his lack of
cooperation with attorneys or mental health professionals
was voluntary and goal directed."

Venard concluded that Smart engages in "partial
malingering." Malingering describes a person "who is
intentionally producing symptoms in order to get out of
something." Partial malingering, by contrast, is when the
individual exaggerates very real symptoms, but can control
those symptoms and "learn[s] how to use them to [his or
her] own best benefit." In Venard's opinion, Smart is
"intentionally in control of his mental health symptoms
and [is] able to use those symptoms in order to obtain a
goal of getting out of jail and moving into a much more
comfortable situation," like the state hospital system.
FN4.

### c. Dr. Joel Leifer

Dr. Joel Leifer is a forensic psychologist employed by
the State of California to perform psychological
evaluations, competency assessments and sanity evaluations
on behalf of various counties. Leifer evaluated Smart on
three occasions during the course of the lower court
proceedings. He was called by the prosecution to testify
as an expert in the field of psychology.

On May 2, 2001, Leifer interviewed Smart at the San
Mateo County jail in order to determine if he was sane or
insane at the time the offenses were committed. In a May
15, 2001 report, Leifer concluded that Smart was sane when
the offenses were committed. During the interview Smart
"appeared profoundly psychiatrically compromised. He was
mute. He was nonresponsive, and he rocked incessantly in
his chair." However, Smart's presentation at the time of
the interview did not answer the legal question whether
Smart was sane in October 1997. Leifer concluded that the
audio tape of Smart's police interview after his October
1997 arrest indicated that Smart understood the
wrongfulness of his conduct because he denied committing

12

the exposures and stated that "he wouldn't do something
like that because something like that was wrong."

Leifer interviewed Smart again on February 14, 2002, to
determine whether Smart was competent to stand trial and
concluded that Smart was "trial incompetent." Leifer's
conclusion was based primarily on Smart's catatonic
demeanor during his interview. Although there were
questions of malingering, Leifer testified that he could
not "disregard [Smart's] very convincing presentation at
that time."

In November 2003, Leifer conducted another competency
evaluation. In a report dated November 18, 2003, Leifer
concluded that Smart was competent to stand trial. Leifer
also opined that Smart was presently sane and noted that
Smart had been "able to discuss his case coherently and
consistently and with relevance." However, Leifer also
found that Smart was insane at the time the offenses were
committed. During the November 2003 interview, Smart
provided a "very clear, coherent, rational explanation of
what was going on in his mind at the time of the offense."
Smart told Leifer that "his actions were commands from
God, and that he was his son Jesus." God ordered him to
masturbate in front of women and he had to obey God's
orders. The clarity and forcefulness with which Smart
expressed his delusions led Leifer to change his opinion
about Smart's sanity and to conclude that Smart was not
sane when the offenses were committed.

In 2004, Leifer changed his opinion again and concluded
that Smart was sane at the time of the offenses. Leifer
testified at trial that, when he interviewed Smart in
November 2003, he had some concern about malingering but
ultimately concluded that Smart was a schizophrenic person
who also exaggerated his symptoms. However, during the
months following that interview, Leifer reviewed, for the
first time, Smart's extensive treatment records. Leifer
was persuaded by those records and the events documented
therein that Smart was a malingerer. Those records showed
that Smart had turned his symptoms on and off depending on
his goals and the people around him. Leifer also noted
that Smart was "overheard educating other inmates on how
to malinger symptoms so that they can be found to
be trial incompetent." Leifer ultimately concluded that
the "very sophisticated techniques" that Smart had
employed over the years were not consistent with a
diagnosis of schizophrenia.

        d. Dr. Ronald Roberts

Dr. Ronald Roberts is a psychologist, licensed since

13

1984, who testified on behalf of the prosecution as an
expert in the field of psychology.

Roberts interviewed Smart on January 14, 2004. During
the interview, Smart was "very focused, somewhat upbeat in
his demeanor," reported that he was being treated poorly
by the jail and tried to get Roberts to feel sorry for
him. Early in the interview, Smart volunteered that he
currently knew that indecent exposure was a crime but
claimed that, at the time of the offenses, he did not know
his conduct was unlawful because he "was being directed by
mental delusions."

It appeared to Roberts that Smart had a story he was
ready to tell at the January 2004 interview. Smart's "very
elaborate story" was about how he was raped at knife point
when he was a child by a federal officer and, since that
time, federal agents had been after him and had entered
his body. Smart reported that God told him Federal agents
were trying to kill him and the only way to protect
himself was to kill them by masturbating. Roberts
testified that Smart also explained that he "was
delusional regarding the need to masturbate in front of
women for the first two incidents, but not at the time of
the third incident" when he "was just looking for a place
to go to the bathroom." Roberts testified that Smart
appeared to appreciate that his conduct was wrong because
he essentially used the delusions as an excuse for
behavior that would otherwise be against the law and
deserving of punishment.

Roberts identified several factors which were
inconsistent with the conclusion that Smart suffers from
schizophrenia. For example, Smart's purported delusions
were very concise and clearly explained whereas
schizophrenics think in a "very jumbled" and "scattered"
manner. Also, Smart claimed to have clear visual delusions
which would be rare for a schizophrenic to experience. In
addition, Smart had been involved in a long-term romantic
relationship and Roberts had never known anyone with
paranoid schizophrenia to have had that kind of long term
romantic relationship.

Roberts acknowledged that "sometimes individuals who
may be actively psychotic may get put on medications and
have the active signs of psychosis subside," but found
that this possibility did not apply to Smart. Smart's
medical records showed that he was not taking any
psychiatric medication during the initial phase of his
incarceration after his arrest for the charged offenses,
and yet he did not report any psychiatric symptoms.
Indeed, Smart did not even make the claim that he was

14

psychotic at the time of the charged offenses until 1999.
Roberts testified that these circumstances were not
consistent with a diagnosis of schizophrenia.
Schizophrenics who are not on medication cannot control
their symptoms and Smart's alleged psychotic symptoms
could not have gone unnoticed for the lengthy period of
time during which he was incarcerated but not taking any
medication.

Roberts administered two psychological tests during his
interview with Smart, a Structured Interview of Reported
Symptoms (SIRS), which is designed to help identify
patients who are faking schizophrenic types of disorders
and a Rorschach test which is used to identify
schizophrenic or psychotic disorders in general. Smart's
responses to the Rorschach test "gave no indication of
schizophrenia or any type of psychotic disorder." The
results of the SIRS established a "concern about the
possibility of malingering," although Roberts could not
conclude that there was malingering based upon that one
test.

Roberts found additional evidence of malingering in
Smart's records. Police reports from the time when the
crimes were committed did not contain any report of "any
type of psychotic symptom whatsoever," or any sign that
Smart was suffering from a mental illness. Medical and
hospital records showed that Smart came to the attention
of mental health professionals only after he was charged
with a crime. Roberts also noted that the records showed
that Smart's symptoms of schizophrenia surfaced whenever
it was time for Smart to appear in court. Roberts also
found "multiple, multiple notations in the records about
malingering."

Ultimately, Roberts concluded: "From my perspective in
being a psychologist with over 30 years of experience in
evaluating individuals that have psychotic problems, I saw
absolutely no evidence at any time at the commission of
these crimes of any type of significant defect in his
mental state that might warrant considering insanity."
Roberts also stated that all of the information he
considered suggested that Smart "knew the difference
between right and wrong and knew that the acts that were
being committed were wrong."

FN2. Stains on the shirt tested positive for semen.
However, the sample was degraded and could not be matched
to Smart's DNA.

FN3. The prosecution called several other witnesses who
had previously testified at Smart's guilt trial.

15

1

2          FN4. Venard found many examples of this behavior
           documented in Smart's medical history. Another example
3          occurred during Venard's interview when Smart admitted
           that he had "decided not to eat or sleep so he would get
4          out of jail."

   Opinion at 4-17 (footnotes in original).
5
                              LEGAL STANDARD
6
        The Antiterrorism and Effective Death Penalty Act of 1996
7
   ("AEDPA"), codified under 28 U.S.C. § 2254, provides "the exclusive
8
   vehicle for a habeas petition by a state prisoner in custody
9
   pursuant to a state court judgment, even when the petitioner is not
10
   challenging his underlying state court conviction." White v.
11
   Lambert, 370 F.3d 1002, 1009-10 (9th Cir. 2004). Under AEDPA, this
12
   Court may entertain a petition for habeas relief on behalf of a
13
   California state inmate "only on the ground that he is in custody in
14
   violation of the Constitution or laws or treaties of the United
15
   States." 28 U.S.C. § 2254(a).
16
        The writ may not be granted unless the state court's
17
   adjudication of any claim on the merits: "(1) resulted in a
18
   decision that was contrary to, or involved an unreasonable
19
   application of, clearly established Federal law, as determined by
20
   the Supreme Court of the United States; or (2) resulted in a
21
   decision that was based on an unreasonable determination of the
22
   facts in light of the evidence presented in the State court
23
   proceeding." 28 U.S.C. § 2254(d). Under this deferential standard,
24
   "a federal habeas court may not issue a writ simply because that
25
   court concludes in its independent judgment that the relevant
26
   state-court decision applied clearly established federal law
27

28                                  16

erroneously or incorrectly.  Rather, that application must also be unreasonable." Williams v. Taylor, 529 U.S. 362, 411 (2000).  In Harrington v. Richter, the Court further stresses that "'an unreasonable application of federal law is different from an incorrect application of federal law.'"  131 S. Ct. 770, 785 (2011) (citing Williams, 529 U.S. at 410) (emphasis in original).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Id. at 786 (citing Yarborough v. Alvarado, 541 U.S. 653, 664 (2004)).

While circuit law may provide persuasive authority in determining whether the state court made an unreasonable application of Supreme Court precedent, the only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) rests in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. Williams, 529 U.S. at 412; Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003).

The state court decision to which 28 U.S.C. § 2254 applies is the "last reasoned decision" of the state court. See Ylst v. Nunnemaker, 501 U.S. 797, 803–804 (1991); Barker v. Fleming, 423 F.3d 1085, 1091–1092 (9th Cir. 2005).  Although Ylst primarily involved the issue of procedural default, the "look through" rule announced there has been extended beyond that particular context. Barker, 423 F.3d at 1092 n.3 (citing Lambert v. Blodgett, 393 F.3d 943, 970 n.17 (9th Cir. 2004) and Bailey v. Rae, 339 F.3d 1107, 1112–1113 (9th Cir. 2003)).

17

1    Even if a petitioner meets the requirements of § 2254(d),

2  habeas relief is warranted only if the constitutional error at issue

3  had a substantial and injurious effect or influence in determining

4  the jury's verdict.  Brecht v. Abrahamson, 507 U.S. 619, 638 (1993).

5  Under this standard, petitioners "may obtain plenary review of their

6  constitutional claims, but they are not entitled to habeas relief

7  based on trial error unless they can establish that it resulted in

8  'actual prejudice.'"  Brecht, 507 U.S. at 637, citing United States

9  v. Lane, 474 U.S. 438, 439 (1986).

10                              DISCUSSION

11    Petitioner raises seven claims in his Petition.  All claims are

12  discussed below.

13  I.   Petitioner's Faretta Request

14    Petitioner contends that his constitutional rights were

15  violated when the state court denied his request to represent

16  himself pursuant to Faretta v. California, 422 U.S. 806 (1975).

17  The state court considered this issue in a lengthy, reasoned opinion

18  on direct appeal.

19    First, the state court reviewed the circumstances surrounding

20  Petitioner's motion to represent himself at the sanity phase of his

21  trial.

22    1. Background

23    As noted above, Smart's April 22 Marsden and April 26
    Faretta motions were both heard and denied by Judge
24  Grandsaert on May 4, 2005.  FN5.  At that time, the sanity
    phase of Smart's trial was scheduled to commence on May
25  23, 2005, and the prosecution opposed any further
    continuances.

26
    The Marsden motion was directed at Steven Chase,
27

28                              18

Smart's fourth attorney during the lower court proceedings, who had represented Smart during the guilt phase of the trial. The transcript of the hearing reflects that Smart had made four prior <u>Marsden</u> motions all of which had been denied. Smart made several complaints about his defense counsel, including that Chase (1) accused him of faking his mental illness, (2) did not attempt to stop the guilt trial on the ground that Smart was incompetent; (3) did not present a defense at the guilt phase; (4) was not adequately prepared for the sanity phase; (5) intended to call only two doctors at the sanity phase; and (5) had failed to obtain relevant medical records and documentation. The trial court denied the <u>Marsden</u> motion, stating that defense counsel was a "very experienced, excellent defense attorney" who was as "good an advocate as any lawyer can be."

After the <u>Marsden</u> motion was denied, the court entertained Smart's <u>Faretta</u> motion. The court asked Smart several questions. It inquired why Smart had filed so many <u>Marsden</u> motions to which Smart replied he had been receiving "ineffective assistance of counsel." The court asked whether Smart remembered what happened during the guilt phase. Smart responded: "Vaguely, yes I do. And it had to do with the fact -- I told you in the <u>Marsden</u> hearing about what -- the doctor had found me to be incompetent before I went to trial." FN6. The court asked whether Smart was still having delusions. Smart responded that he was "competent," and that it had been "quite awhile" since he had heard voices. He explained that, over the years, he had experienced "mental illnesses" at various times, that he knows "when it's coming on," and that at the present time, he was "very competent," and was "not having any problems." Smart reiterated that he was not competent at the guilt phase because that is what the psychiatrist said. He stated that he goes through a "process of hearing voices, being delusional," and that when that happened it could get so bad that he did not "know nothing at all."

When the court asked Smart whether he would be ready to proceed with the trial on the scheduled date, Smart replied: "I think I'm ready to proceed on that date. If not, if I have to look over all the records, I want to get a trial as soon as possible, Your Honor, like I said. A couple weeks longer, maybe, or something, at the most. I want to go to court in trial as soon as possible. I'm not trying to put a trial off, Your Honor. I'm trying to go to trial and trying to win it."

The court prefaced its ruling by expressing its opinion that Smart was articulate and intelligent, mentally ill

19

but competent to stand trial. The court then shared several concerns including that (1) the case was seven years old, (2) Smart's delusions and resulting problems with historical reality did not render him incompetent but would affect his ability to represent himself, (3) Smart's request was being made mid-trial, after the guilt phase was already completed, (4) it appeared that Smart's real motivation was to get rid of his current counsel and further delay the proceedings, (5) Smart had already made so many <u>Marsden</u> motions, and (6) Smart had been disruptive during the guilt phase of the trial.

With respect to its concern about Smart's prior disruptive behavior, the court gave two examples. It mentioned Smart's behavior during the first few days of the guilt phase when Smart attempted to convince the trial court he was not competent. The court also referred to an incident during the defense closing argument. Smart opened his shirt to show the jury that he did not have a mole or birthmark on his chest after reference was made to the fact that Katrina Stanley had reported to police that she thought she saw a mark on the chest of the man who exposed himself to her.

Ultimately, the court denied the <u>Faretta</u> motion on the following grounds: "In light of the fact that this case has been going on for several years. In light of the fact that you acted in a way that disrupted court proceedings at the first phase of this trial, in terms of what you did during closing argument. In light of the fact that you refused to come to court and attempted to disrupt proceedings there. In light of the fact that I don't believe that you would be ready to proceed to trial on May 23rd if I were to grant your motion, because of the kinds of things you said to counsel this morning, about how there's so little time left, and there's not much time left for Mr. Chase to complete the work that needs to be done in your opinion. I'm concerned when you say that you're not going to ask for a continuance, that it's either unrealistic or untrue with what you intend to do. [¶] I don't see how you can say to Mr. Chase that he's not going to be able to be ready for trial on May 23rd, and yet say that you would be ready for trial on May 23rd. {¶] I think, in light of that history, in light of the present setting of the case, in light of the People's right to proceed to trial after seven years, in light of your conduct in the first phase of this trial.... [¶] I don't believe that you truly do seek the right to represent yourself as opposed to desire to get rid of you're [sic] appointed counsel. I think that your request is being made here for purposes of getting rid of counsel and for the purpose of delaying proceedings. I think you would disrupt proceedings in the second phase of this trial, as you did

20

1    in the first phase."

2    FN5. Although the transcript of the <u>Marsden</u> hearing was
     originally filed under seal, relevant portions of the
3    transcript were unsealed pursuant to this court's order.

4    FN6. During the <u>Marsden</u> hearing, Smart maintained that,
     before the guilt phase of the trial commenced, a doctor
5    named Al Bruce found that he was not competent to stand
     trial. However, Chase advised the court: "I know nothing
6    about that doctor. And -- and like I say, I sat through
     the trial with this man. I talked to him daily. He was not
7    incompetent. That's just -- that's a fact."

8  Opinion at 17-20 (footnotes in original).

9       The state appellate court then engaged in a lengthy discussion

10  as to whether the trial court had abused its discretion in denying

11  Petitioner's <u>Faretta</u> motion.  The appellate court held that the

12  trial court had been correct in concluding both that Petitioner's

13  <u>Faretta</u> motion had been untimely and that even if it had been

14  timely, it was made for the purposes of delay and thus was properly

15  denied.  Opinion at 21-23.

16      As to timeliness, the state appellate court found that:

17     The objectively verifiable facts support the lower court's
       conclusion that the motion was made mid-trial.  Trial
18     commenced on October 20, 2003, and the verdict that Smart
       was sane was returned on January 26, 2006.  Only the guilt
19     phase of the trial had been completed when Smart made his
       <u>Faretta</u> motion on April 26, 2005.
20
21  Opinion at 21.  The court also rejected as without merit

22  Petitioner's unsupported argument that his <u>Faretta</u> motion ought to

23  have been treated the same as a motion made before trial.  <u>Id.</u>

24      The state appellate court also rejected Petitioner's argument

25  that his motivation for the motion was irrelevant.  Opinion at 24.

26  Rather, "'in order to protect the fundamental constitutional right

27  of counsel, one of the trial court's tasks when confronted with a

28                                21

motion for self-representation is to determine whether the defendant truly desires to represent himself or herself." Id. (citing People v. Marshall, 15 Cal. 4th 1, 23 (1997).  As a result:

> Under the circumstances presented here, the lower court could reasonably have concluded that Smart lacked the desire and, indeed, the intention to actually represent himself at trial and that he attempted to invoke his Faretta right either (1) in haste and out of frustration because his Marsden motion was denied; or (2) pursuant to a plan to shed himself of counsel, delay the proceedings, and later claim that he needed a new attorney to assist him at the sanity phase of the trial.

> . . .

> To summarize, Smart did not have an unqualified constitutional right to represent himself during the second half of his trial and he has failed to show that the lower court abused its discretion by denying the mid-trial Faretta motion.

Opinion at 25.

Petitioner cannot demonstrate that the California Court of Appeal's reasoned decision was contrary to, or involved an unreasonable application of, clearly established United States Supreme Court law.  Nor can he demonstrate that the state court's factual findings were unreasonable.

The United State Supreme Court has confirmed that a criminal defendant has a Sixth Amendment right to self-representation. Faretta v. California, 422 U.S. 806, 832 (1975).  A defendant's decision to represent himself and waive the right to counsel, however, must be unequivocal, knowing and intelligent, timely, and not for purposes of securing delay.  Id. at 835; United States v. Arlt, 41 F.3d 516, 519 (9th Cir. 1994); Adams v. Carroll, 875 F.2d 1441, 1444 & n.3 (9th Cir. 1989).  Here, as the state court reasonably concluded, Petitioner's motion to represent himself was

22

both untimely and made for the purposes of delay.  Opinion at 17–26.
Petitioner can cite no clearly established law indicating that the
state court decision was in error.

In addition, even if Petitioner had demonstrated a colorable
claim of error, he would not be able to show that any error had a
substantial or injurious effect on the verdict.  <u>Brecht</u>, 507 U.S. at
638.  There is no indication in the record that the result of the
trial would have been favorable to Petitioner if he had represented
himself.  Because Petitioner cannot demonstrate that the trial
court's denial of his <u>Faretta</u> motion prejudiced him, Petitioner's
claim must be denied.

II.  Right to An Impartial Judge

Petitioner alleges he was subject to judicial bias, because the
judge who decided his <u>Faretta</u> motion was a former prosecutor and had
made an appearance in his case seven years earlier.  As a result,
according to Petitioner, his due process right to an impartial judge
was violated.  The state court considered this issue in a reasoned
opinion on direct appeal.

First, the state court set forth Petitioner's key allegations.
Judge Grandsaert, who denied Petitioner's <u>Faretta</u> motion, had
previously been a deputy district attorney.  Opinion at 54.  During
his time as a deputy D.A., Judge Gransaert made an appearance at a
March 2, 1998 hearing in Petitioner's case.  Opinion at 55.  The
hearing was not substantive; rather, it was a routine matter to
continue a date.  According to Petitioner, Judge Gransaert's earlier
appearance rendered him biased in favor of the prosecution on May 4,
2005 when he heard and denied Petitioner's <u>Faretta</u> motion.  Opinion

23

at 54.

After first holding that Petitioner's claim of judicial bias was procedurally defaulted, the state court turned to the merits of the claim. Opinion at 57. The court first noted that state law was "unsettled as to whether proof of actual bias is required or if the appearance of bias may be sufficient to establish a due process violation." Opinion at 57 (citing cases). After reviewing the record, the state court found that there was

> no basis for finding actual bias or an appearance of bias. More than seven years _after_ the March 2, 1998 hearing, Judge Grandsaert heard and ruled on Smart's Faretta motion. Smart does not allege that Judge Grandsaert knew or should have recalled that he previously appeared at the March 2, 1998, hearing. Indeed, we do not believe that any reasonable person would expect that the judge would have any recollection of that insignificant hearing. Nor could he have been expected to recognize Smart's name, particularly in light of the fact that, during the Municipal Court proceedings, Smart was formally referred to by his alias, Robert Payne, whereas Smart used his real name at the Faretta hearing. Further, and perhaps most important, there is simply no reason to suspect that one appearance so long ago would have made Judge Grandsaert a biased decision maker when he heard and ruled upon the May 4, 2005 motion.

> Smart contends that "it would be practically impossible" for Judge Grandsaert to be unbiased when he heard and ruled on the Faretta motion. However, we have very carefully reviewed the transcript of the Faretta hearing and have found absolutely no evidence of bias. Smart also argues that the denial of his Faretta motion is, in and of itself, evidence that Judge Grandsaert was biased in favor of the prosecution. Smart reasons that error is more likely to occur during a trial when the defendant represents himself than if he is represented by counsel. Therefore, Smart contends, Judge Grandsaert denied the Faretta motion in order [to] increase the likelihood that the jury would return an error-free finding that Smart was sane when the offenses were committed and would thereby deprive Smart of the opportunity to obtain a reversal of the judgment. We reject this remarkably irrational argument. To the extent any judge is motivated by an intention to provide a fair, error-free, trial, that motivation is not evidence of

24

1    bias.

2         To summarize, we hold that . . . the evidence
     submitted in support of the petition does not support the
3    allegations that Smart's due process rights were violated
     when Judge Grandsaert heard and ruled on the <u>Faretta</u>
4    motion.

5    Opinion at 58-59.

6         Here, Petitioner has not demonstrated that the state court's

7    reasoned opinion is contrary to, or an unreasonable application of,

8    clearly established United States Supreme Court law.   Petitioner

9    also fails to demonstrate that the state court's opinion relied on

10   an unreasonable determination of the facts.

11        The due process clause guarantees criminal defendants the right

12   to a fair and impartial judge.   <u>In re Murchison</u>, 349 U.S. 133, 136

13   (1955).   A claim of judicial misconduct by a state judge in the

14   context of federal habeas review, however, does not simply require

15   that the federal court determine whether the state judge committed

16   judicial misconduct; rather the question is whether the state

17   judge's behavior "rendered the trial so fundamentally unfair as to

18   violate the federal due process clause under the United States

19   Constitution."   <u>Duckett v. Godinez</u>, 67 F.3d 734, 740 (9th Cir. 1995)

20   (citations omitted).   In addition, federal habeas relief is limited

21   to those instances where there is proof of actual bias, or of a

22   possible temptation so severe that one might presume an actual,

23   substantial incentive to be biased.   <u>See</u>, <u>e.g.</u>, <u>Del Vecchio v.</u>

24   <u>Illinois Dep't of Corrections</u> 31 F.3d 1363, 1380 (7th Cir. 1994) (<u>en</u>

25   <u>banc</u>).

26        Petitioner can cite no clearly established Supreme Court law

27   demonstrating that the state court's decision that Judge Grandsaert

28                                    25

had no actual or apparent bias was unreasonable.  Moreover, as the state court concluded, Petitioner cannot demonstrate that the decision by Judge Grandsaert to deny Petitioner's <u>Faretta</u> request was harmful to Petitioner; as such, Petitioner cannot show that any action by Judge Grandsaert rendered his trial "fundamentally unfair."  <u>Duckett</u>, 67 F.3d at 740.  Thus, Petitioner's claim must be denied.

III. Trial Court's Refusal To Order A New Competency Hearing

     In this claim, Petitioner maintains that his due process rights were violated when the state trial court refused to hold competency hearings during the sanity phase of Petitioner's trial.  The state court considered this claim in a section of its lengthy, reasoned opinion on direct appeal.

     First, the state court reviewed the factual background of this claim.  When the sanity phase of Petitioner's trial[1] commenced on January 16, 2006, defense counsel Chase made a motion to continue the trial in order to hold a competency examination of Petitioner. Opinion at 26.  The prosecutor objected to the motion, noting "that this was the fourth time that Smart had claimed to become incompetent on the eve of trial" and that Petitioner had a history of malingering.  Opinion at 27.

          After the matter was submitted, the trial court
          reviewed the "extraordinary" history of the case.  It
          noted, among other things, that charges had been filed in
          April 1998 for offenses that occurred in October 1997,
          that Smart had been represented by at least four
          attorneys, that there had been several <u>Marsden</u> motions,
          and that criminal proceedings had been suspended due to

_____

     [1]The guilt and sanity phases of Petitioner's trial were presided over by Judge Hall, not Judge Grandsaert.

incompetency more than once. The guilt phase finally commenced in October 2003 and the court recalled the following about Smart's appearance at trial: "When Mr. Smart came into the courtroom on that date, as I recall, he was manifesting a number of physical symptoms and symptomology which included attempting to be frothing at the mouth and acting completely incoherent . . . I made findings and expressed to Mr. Smart the fact that we were in fact going to be proceeding with this trial and the fact that this Court viewed [his conduct] as being an act of malingering, [that] was not going to be accepted or tolerated. [¶] And suddenly Mr. Smart immediately stopped his theatrics and sat through the entirety of the trial . . . ." The court noted that after the guilt phase was completed the trial was continued several times for various reasons including the need to review Smart's "voluminous" medical records from Napa, Atascadero and the jail.

The court stated that it had reviewed and considered Chase's declaration, the arguments of counsel, the court file, and its own notes from observations of Smart, and the relevant law and that it had "carefully analyzed this matter." The court acknowledged that Chase had "gone beyond the call in his representation of Mr. Smart," and that it would likely have made this motion had it been in his shoes. Nevertheless, the court denied the request for a competentcy examination with the following statement:

"But from all I have seen at this point, I have not seen a sufficient showing of substantial change in circumstances to warrant at this point a further suspension of proceeding under [§§ 1367-1368] of the Penal Code based upon the prior adjudications in this matter and based upon Mr. Smart's demonstrated pattern of conduct in this very department. That certainly is not saying he doesn't have issues, which we will be addressing during the sanity phases which we will be proceeding on. [¶] So, Mr. Smart, we are going to be proceeding to the sanity phase. So I would urge you to cooperate with Mr. Chase during the course of these proceedings. . . ."

Opinion at 27-28.

After the trial, defense attorney Chase brought a motion for a new trial arguing that Petitioner was denied a fair trial at the sanity phase because the trial court had not permitted a medical determination as to whether Petitioner was competent to stand trial. Opinion at 30. The appellate court summarized the trial court's

27

findings as follows:

> The trial court prefaced its ruling by observing that Chase was a tireless advocate and by sharing its view that the rights of criminal defendants are "sacred rights." Then, the court made the following statement: "I will say candidly from my perspective sitting here as a trial judge, both guilt phase and sanity phase, I have never in my entire life in many different careers ever seen an individual who in the Court's assessment has abused the process of the Courts and tried to take advantage of those rights which we set forth for criminal defendants than Mr. Smart. [¶] I find Mr. Smart to be what I would only characterize as a master manipulator who has done everything humanly possible to [set] every conceivable booby trap . . . for any reviewing Court as it relates to the handling for this matter dating back to the time when he first wheeled into Court for the guilt phase in this trial in 2003."

> The court referred again to Smart's behavior at the commencement of the guilt phase. It also recalled that during the sanity phase, it appeared that Smart intentionally exaggerated his symptoms as he was wheeled closer to the courtroom and that, on another occasion while defense counsel was examining a witness, Smart opened one eye and looked around as if to orient himself. The court also stated that the record was replete with evidence that Smart had been "using and abusing both the criminal justice system as well as the mental health system dating back decades."

> The court concluded there was not substantial evidence to warrant another medical status examination and stated: "I believe it was a dilatory tactic, and frankly, a very good one done on the part of Mr. Smart much to the dismay of his counsel, but if you look at it objectively made a tremendous amount of sense from Mr. Smart's part because it yet creates another issue for the purpose of appeal in this case." Accordingly, the court denied the new trial motion.

Opinion at 31.

Finally, the state appellate court analyzed the merits of Petitioner's claim.

> "[T]rial of an incompetent defendant violates an accused's right to due process.' [Citations.] The United States Supreme Court has defined competence to stand trial as a defendant's "'sufficient present ability to consult with his lawyer with a reasonable degree of rational

28

understanding' and 'a rational as well as factual understanding of the proceedings against him.'" [Citation.] Under California law, a person is incompetent to stand trial 'if, as a result of a mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner.' [Citation.] A defendant is presumed to be mentally competent to stand trial. [Citation]" (People v. Young (2005) 34 Cal. 4th 1149, 1216.)

"When the accused presents substantial evidence of incompetence, due process requires that the trial court conduct a full competency hearing. [Citation.] . . . The court's duty to conduct a competency hearing arises when such evidence is presented at any time 'prior to judgment.' [Citations.] [¶] When a competency hearing has already been held and the defendant has been found competent to stand trial, however, a trial court need not suspend proceedings to conduct a second competency hearing unless it 'is presented with a substantial change of circumstances or with new evidence' casting a serious doubt on the validity of that finding. [Citations.]" (People v. Jones (1991) 53 Cal. 3d 1115, 1152-1153 (Jones).)

In the present case, when Smart made a request for a competency hearing on the first day of the sanity phase of the trial, three prior competency hearings had already been held and a determination made that, as of June 10, 2003, Smart was competent to stand trial.  Therefore, the trial court was not required to suspend proceedings again and conduct a fourth competency hearing unless it was presented with a "substantial change of circumstance" or with new evidence that cast a "serious doubt" on the validity of the most recent competency finding.  (Jones, supra, 53 Cal. 3d at p. 1153.)

On appeal, Smart contends that there was a change of circumstances and substantial new evidence which raised a doubt about his competency and required a new competency hearing.  We, like the trial court, reject this contention.  Smart's behavior at the sanity phase was neither new nor a change of circumstance.  His history of engaging in just such conduct whenever he was required to come to court to face a criminal charge was well-documented.  The trial court was not only familiar with that history, it had observed this type of behavior first-hand at the commencement of the guilt phase.

Smart attempts to portray his conduct at the sanity phase as new evidence by pointing out that, in contrast to the guilt phase, his symptoms did not disappear after the

29

court advised him that the trial could continue.  However,
the evidence shows that Smart did cease his behavior
within days after the sanity verdict was announced.  As he
had done on numerous prior occasions, Smart displayed his
symptoms of mental illness for a period during which he
believed it benefited [sic] him to appear incompetent.  In
other words, Smart's behavior at the sanity phase was not
a substantial change of circumstance when viewed in the
context of his extensive documented history with the
criminal justice system.

    To the extent a distinction can be drawn between
Smart's behavior at the sanity phase as compared to his
prior behavior at the guilt phase, that distinction does
not establish error on the part of the trial court.  By
the time of the new trial motion, it had become even more
apparent to the court that Smart's behavior at the sanity
phase was nothing more than a new way to play an old game
and that it did not raise a serious doubt about the prior
finding of competence.  As reflected in the record of the
hearing on Smart's new trial motion, the court observed
additional signs of malingering during the sanity phases.
Employees at the jail where Smart was held during this
period also observed instances when Smart engaged in
behavior which was inconsistent with the notion that his
presentation at trial was genuine.  Indeed, by conclusion
of this trial, there was overwhelming evidence before the
court that Smart was intentionally attempting to appear
incompetent at the sanity phase.  His effort to appear as
such, to the extent distinguishable from prior occasions,
was not substantial evidence "casting a serious doubt on
the validity" of the prior finding that he was competent.
(Jones, 53 Cal. 3d at p. 1153.)

    Smart repeatedly complains that the trial court erred
by relying on its own observations and its own opinion
that Smart was a malingerer.  In fact, though, the very
reason we show deference to a trial court's decision
whether to hold a competency hearing once a finding of
competence has already been made is that we, as an
appellate court, are "'in no position to appraise a
defendant's conduct in the trial court as indicating
insanity, a calculated attempt to feign insanity and delay
the proceedings, or sheer temper.'" [Citations.]
(Marshall, supra, 15 Cal. 4th at p. 33.)  In this case,
when the trial court was presented with the request for a
competency examination, it was uniquely qualified to make
that determination.  Not only was there a documented
history of Smart's behavior at other criminal proceedings,
the court itself had witnessed that behavior during the
beginning of the guilt phase.  With that tremendous
benefit, the court's observations and assessment of Smart
at the sanity phase are particularly valuable and we will

30

not second guess them.

> We accept and affirm the trial court's determination
> that Smart's behavior at the sanity phase was not a
> substantial change of circumstances but part and parcel of
> a pattern of conduct going back several years.  In light
> of that finding, the court was not required to hold
> another competency examination during the sanity phase of
> the trial.

Opinion at 32-34.

Due process requires a trial court to order a psychiatric

evaluation or conduct a competency hearing if the court has a good

faith doubt concerning the defendant's competence.  <u>Pate v.</u>

<u>Robinson</u>, 383 U.S. 375, 385 (1996); <u>Cacoperdo v. Demosthenes</u>, 37

F.3d 504, 510 (9th Cir. 1994).  This responsibility continues

throughout trial.  <u>Drope v. Missouri</u>, 420 U.S. 162, 181 (1975).  A

good faith doubt about a defendant's competence arises "'if a

reasonable judge, situated as was the trial court judge whose

failure to conduct an evidentiary hearing is being reviewed, should

have experienced doubt with respect to competency to stand trial.'"

<u>Maxwell v. Roe</u>, 606 F.3d 561, 568 (9th Cir. 2010) (quoting <u>De</u>

<u>Kaplany v. Enomoto</u>, 540 F.2d 975, 983 (9th Cir. 1976)).  The doubt

must be "genuine," and the simple existence of some evidence

indicating possible incompetency does not automatically trigger a

hearing.  <u>DeKaplany</u>, 540 F.2d at 982-983.  A state court's

determination that a defendant is competent is a factual finding

that is presumed correct.  28 U.S.C. § 2254(e)(1); <u>see also</u> <u>Maggio</u>

<u>v. Fulford</u>, 462 U.S. 111, 117 (1983).

Here, Petitioner has not demonstrated that the state court's

reasoned opinion is contrary to, or an unreasonable application of,

clearly established United States Supreme Court law.  Petitioner

31

1    also fails to demonstrate that the state court's opinion relied on

2    an unreasonable determination of the facts.

3         As the state court's reasoned opinion clearly demonstrates, the

4    experience and judgment of the trial judge, together with the prior

5    finding of competence and the evidence of prior malingering on

6    Petitioner's part, confirm that it was not unreasonable for the

7    trial court not to conduct another competency hearing.  Petitioner's

8    competency had already been determined, and he has not demonstrated

9    that there was a substantial change of circumstances or new evidence

10   casting a serious doubt on the validity of that finding.  See Jones,

11   53 Cal. 3d at 1153; Opinion at 33.

12        Petitioner's case may be distinguished from Maxwell, where the

13   Ninth Circuit found that a trial court's failure to conduct

14   additional competency hearings constituted a due process violation.

15   606 F.3d at 575-576.  In Maxwell, the defendant missed a substantial

16   part of his trial after being placed on a fourteen-day psychiatric

17   hold due to a suicide attempt.  Id. at 571-572.  This hold meant

18   that a mental health professional had determined that Maxwell had a

19   mental disorder that rendered him "a danger to others, or to himself

20   or herself, or gravely disabled."  Id. at 572-573 (citing Cal. Welf.

21   & Inst. Code §§ 5150 & 5240).  The Ninth Circuit held that these

22   facts should have triggered a competency hearing and that "[n]o

23   reasonable judge, situated as the state trial judge was here, could

24   have proceeded with the trial without doubting Maxwell's competency

25   to stand trial."  Id. at 573.

26        Here, however, no comparable facts were presented to the trial

27   judge.  There were no attempts at self-harm by Petitioner, and no

28                                    32

subsequent psychiatric commitment as a result that caused him to miss important parts of his trial.  Moreover, Petitioner had a documented history of malingering and "there was overwhelming evidence before the court that Smart was intentionally attempting to appear incompetent at the sanity phase."  Opinion at 33.  Therefore, it was not unreasonable for the appeals court to uphold the trial court's finding, and conclude that "Smart's behavior at the sanity phase was not a substantial change of circumstance when viewed in the context of his extensive documented history with the criminal justice system."  Opinion at 33.  Petitioner's claim must be denied.

IV.   State Mental Hospital Confinement

     In claim four, Petitioner maintains that his federal due process and equal protection rights were violated when he was committed pre-trial to a state mental hospital, allegedly for longer than the time period allowed under Cal. Penal Code § 1370(c).  The state court addressed this issue in its reasoned opinion on direct appeal.

     The state court first reviewed the history of Petitioner's commitments and determined that they "ended before expiration of the three-year period" allowed under Cal. Penal Code § 1370(c).  Opinion at 35.  Petitioner argued on appeal that his mental hospital commitments could not exceed six months, an argument that the state court rejected, finding that under the applicable state law, "the maximum period of confinement in Petitioner's case is three years."  Opinion at 37.  Relying primarily on People v. Johnson, 145 Cal. App. 4th 895, 904 (2006), the state court denied Petitioner's claim on the merits.

33

Petitioner has failed to state a valid federal claim.  A person in custody pursuant to the judgment of a state court can obtain a federal writ of habeas corpus only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a).  In other words, "it is only noncompliance with <u>federal</u> law that renders a State's criminal judgment susceptible to collateral attack in the federal courts." <u>Wilson v. Corcoran</u>, 131 S. Ct. 13, 16 (2010) (emphasis in original). The Supreme Court has repeatedly held that a federal habeas writ is unavailable for violations of state law or for alleged error in the interpretation or application of state law.  See <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991); <u>Engle v. Isaac</u>, 456 U.S. 107, 119 (1982); <u>Peltier v. Wright</u>, 15 F.3d 860, 861-62 (9th Cir. 1994); <u>see also</u> <u>Little v. Crawford</u>, 449 F.3d 1075, 1082 (9th Cir. 2006) (claim that state supreme court misapplied state law or departed from its earlier decisions does not provide a ground for habeas relief).

While violations of state law generally do not implicate federal due process concerns, a state statute may create a protected "liberty interest"; in such cases, the violation of state law raises federal constitutional concerns on federal habeas corpus.  See <u>Bonin v. Calderon</u>, 59 F.3d 815, 841 (9th Cir. 1995) (<u>Bonin I</u>).  Here, however, Petitioner has not even shown that state law was violated, much less that the state law at issue created a liberty interest protected by federal due process law.  As the state court concluded in its reasoned opinion, the state law at issue allowed for Petitioner's confinement in a mental hospital for up to three years, and Petitioner was detained for shorter than the three-year limit.

34

Petitioner cites nothing demonstrating that the state court decision was in error.

Because Petitioner has not demonstrated either that the state court's reasoned opinion is contrary to, or an unreasonable application of, clearly established United States Supreme Court law or that the state court's opinion relied on an unreasonable determination of the facts, his claim must be denied.

V.   Ineffective Assistance of Counsel

In claim five, which is related to claim four, Petitioner maintains that his Sixth Amendment rights to effective assistance of counsel were violated when his counsel failed to make a motion challenging his pre-trial commitment at a state mental hospital. According to Petitioner, his commitment was in violation of Cal. Penal Code § 1370(c).[2]   The state court denied this claim in its reasoned opinion on direct appeal, holding that because Petitioner had not demonstrated that his commitment was in violation of the applicable law, he had also "not carried his burden of proving either deficient performance or prejudice."  Opinion at 40.

The Sixth Amendment guarantees the right to effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 686 (1984).  To prevail on a claim of ineffective assistance of counsel, Petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced Petitioner's defense.  Id. at 688.  To prove deficient performance, Petitioner must demonstrate

_____

[2] Petitioner did make a pro se motion challenging the time of his commitment in the state mental hospital.  That motion was denied. Opinion at 35.

35

that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms.  Id.  To prove counsel's performance was prejudicial, Petitioner must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id. at 694.

Here, Petitioner has not demonstrated that the state court's reasoned opinion is contrary to, or an unreasonable application of, clearly established United States Supreme Court law.  Petitioner also fails to demonstrate that the state court's opinion relied on an unreasonable determination of the facts.  As stated above, Petitioner has not demonstrated that his pre-trial confinement in a state mental hospital was in violation of state or federal law.  Given that Petitioner's confinement was lawful, any motion by Petitioner's trial counsel arguing that it was improper would likely have been denied.  Strickland and its progeny do not require that trial counsel make futile objections and, thus, the decision of Petitioner's counsel was reasonable under these circumstances.  See Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir. 1994). Furthermore, Petitioner cannot demonstrate that he suffered any prejudice due to his counsel's failure to bring a motion regarding Petitioner's confinement.  Given that any motion would have been futile, there is no reasonable probability that, had the motion been made, the result of the proceeding would have been different. Strickland, 466 U.S. at 693-694.  Accordingly, Petitioner's claim must be denied.

VI.   Prior Convictions

     In claim six, Petitioner maintains that his due process rights

under Apprendi v. New Jersey, 530 U.S. 466 (2000), were violated

because the issue of his prior convictions was determined by a judge

and not a jury.   The state court addressed this issue in its

reasoned decision on direct appeal.

> Smart contends that his constitutional rights were
> violated during the portion of his trial relating to the
> prior conviction allegations because the jury that decided
> the prior conviction allegations was instructed that Smart
> "[was] the person whose name appear[ed] on the documents
> admitted to establish the convictions."
>
> Smart argues this instruction to the jury violated
> Apprendi v. New Jersey (2000) 530 U.S. 466, 490
> (Apprendi), which holds that "[o]ther than the fact of a
> prior conviction, any fact that increases the penalty for
> a crime beyond the prescribed statutory maximum must be
> submitted to a jury, and proved beyond a reasonable
> doubt."   Smart claims he was entitled to a jury
> determination as to whether he was the person who suffered
> the prior convictions alleged in the information.
>
> Section 1025 provides that "the question of whether
> the defendant is the person who has suffered the prior
> convictions shall be tried by the court without a jury."
> (§ 1025, subd. c.)   This provision does not violate
> Apprendi. (People v. Epps (2001) 25 Cal. 4th 19, 23 (Epps)
> [citations omitted]).   As our Supreme Court explained in
> Epps, supra, 25 Cal. 4th at page 23, the Apprendi rule
> does not apply to the fact of a prior conviction, and
> therefore, is not implicated by section 1025.   Therefore,
> we reject Smart's claim that his Apprendi right was
> violated.

Opinion at 49.

     Petitioner has not demonstrated that the state court's reasoned

opinion is contrary to, or an unreasonable application of, clearly

established United States Supreme Court law.   Petitioner also fails

to demonstrate that the state court's opinion relied on an

unreasonable determination of the facts.

As the state court confirmed, Apprendi holds that any fact that increases the penalty for a crime must be determined by a jury except for "the fact of a prior conviction."  530 U.S. at 490.  As Apprendi and subsequent cases have made clear, the fact of a prior conviction is a sentencing factor that may be relied upon to enhance a sentence without being submitted to a jury or proved beyond a reasonable doubt.  Id.; United States v. Pacheco-Zepeda, 234 F.3d 411, 414-415 (9th Cir. 2001) (relying on Apprendi to hold prior convictions, whether or not admitted by defendant on record, are sentencing factors rather than elements of charged crime). Accordingly, Petitioner's claim that his prior convictions needed to be determined true by a jury is without merit and must be denied.

VII. Length of Sentence

In claim seven, Petitioner maintains that his Eighth Amendment rights against cruel and unusual punishment were violated by the imposition of a sentence of seventy-five years to life for his conviction for three counts of indecent exposure with a prior conviction for the same offense.  The state court addressed this issue in its reasoned opinion on direct appeal.

> Smart contends that his Three Strikes sentence violates both the federal and state prohibitions against cruel and unusual punishment.

> "Under the federal Constitution, the issue is whether the sentence is 'grossly disproportionate' to the crime. [Citation.] Under the state Constitution, the issue is whether the sentence 'is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.' [Citation.]" (People v. Gray (1998) 66 Cal. App. 4th 973, 992 (Gray).) FN13.

> In In re Lynch (1972) 8 Cal. 3d 410 (Lynch), our Supreme Court articulated a three-prong inquiry for

38

measuring proportionality pursuant to which courts
(1) consider the nature of the offense and offender,
(2) compare the punishment with the penalty for more
serious crimes in the same jurisdiction, and (3) compare
the punishment to the penalty for the same offense in
different jurisdictions. Before we apply the <u>Lynch</u> factors
in the present case, we summarily reject Smart's
remarkable claim that his case is virtually
indistinguishable from <u>Lynch</u> and that this court is
therefore required by principles of stare decision [sic]
to hold that his sentence constitutes cruel and unusual
punishment. The distinctions between the present case and
<u>Lynch</u> are too numerous and too obvious to merit discussion
here.   FN14.

Turning to the first prong of the <u>Lynch</u> inquiry, Smart
characterizes recidivist indecent exposure as "trivial," a
nuisance type of offense which causes embarrassment but no
physical or psychological harm. We reject this wishful
thinking and superficial analysis of the first prong of
the <u>Lynch</u> test. To properly evaluate Smart's offenses, we
consider the totality of the circumstances surrounding
those offenses, including such factors as motive, the
manner in which the offenses were committed, the extent of
the defendant's involvement and the consequences of his
acts. (<u>People v. Dillon</u> (1983) 34 Cal. 3d 441, 479.)
Furthermore, our consideration of the nature of the
offense and offender must also take into account the
offender's recidivist behavior. (<u>Gray</u>, <u>supra</u>, 66, Cal.
App. 4th at p. 992; <u>People v. Cartwright</u> (1995) 39 Cal.
App. 4th 1123, 1136.)

Smart's present offenses were all committed against
women under circumstances which created a potential for
aggression or violence. Smart confronted his victims in
secluded places during times they were likely to be alone
and vulnerable. The first time he exposed himself to Nancy
Pangilinan, Smart behaved aggressively, walked straight up
to her car door and forced her to almost hit him in order
to get away. Smart approached Katrina Stanley's home late
at night and exposed himself to her after he could see
that she was alone. Smart then exposed himself to
Pangilinan a second time in the same location as before
which indicates he may have been stalking her or intended
to escalate his aggression. Thus, the totality of the
circumstances relating to these current offenses strongly
suggests that Smart created situations in which the
potential for aggression or violence was very real.

Furthermore, Smart's recidivist history is remarkable
and evidences a pattern of sexually charged criminal
behavior which is far from trivial. Smart was 18 years old
when he was first convicted of indecent exposure in 1959.

He suffered two additional exposure convictions in 1963, notwithstanding his claim that he was just relieving himself in public. A 1968 exposure and trespassing conviction related to crimes Smart committed near the grounds of a convalescent hospital. He was arrested for indecent exposure in April 1980, June 1980, and October 1980, and each time pled to other offenses. The October 1980 incident involved allegations that Smart tried to force his way into an apartment where an 11-year-old girl and her younger sister were home alone. Smart was arrested for burglary and attempted sexual assault in October 1982 after breaking into an apartment, awaking the female occupant, and attempting to forcibly restrain her while holding a knife. Smart fled when the woman fought back but was subsequently found and arrested. In 1991, Smart was charged with raping a 70-year-old woman. There was evidence of both physical and emotional abuse of the victim who had limited mobility because of a prior hip operation and who pleaded with Smart that she was just "an old lady." Although Smart was declared incompetent to stand trial, he was subsequently found competent and was convicted of the rape.

Smart's criminal history is not limited to sex offenses. His other numerous convictions include burglary and auto theft in 1961, burglary and larceny in 1963, three burglaries in 1965, and loitering and narcotics violations in 1967. In 1969, Smart was also charged with burglary in Louisiana, but jumped bail and fled the State. He was apprehended the following month in Minnesota after he was arrested for receiving stolen property. After serving a sentence in Minnesota, Smart was returned to Louisiana where he was committed to a state hospital for six years. During that time, Smart wrote letters threatening President Ford's life. Smart later explained he wrote the letters so he could be transferred to a federal facility. Before he could be tried on the federal charges, Smart escaped from the state hospital. Smart was arrested in California in 1976 and was convicted on the federal charges in 1977. He was also convicted of defrauding an innkeeper in 1982 and burglary in 1984.

In light of this and other evidence before us, the first prong of the Lynch test, requiring consideration of the offenses and offender, including in this case Smart's very troubling criminal history, does not support Smart's claim that his sentence is unconstitutionally disproportionate to his crimes.

Turning to the second prong of the Lynch test, Smart contends that his sentence for indecent exposure is "out of balance with the punishment prescribed by California law for offenses which must be deemed more serious."

40

However, case law establishes that "a comparison of
appellant's punishment for his current crimes with the
punishment for other crimes in California is 'inapposite
since it is his recidivism in combination with his current
crimes that places him under the three strikes law.'"
(Gray, supra, 66 Cal. App. 4th at p. 993; People v. Ayon
(1996) 46 Cal. App. 4th 385, 400, disapproved on other
ground by People v. Deloza (1998) 18 Cal. 4th 585, 600.)
In other words, a comparison of Smart's punishment for his
offenses, which includes his recidivist behavior, to the
punishment of others who have committed more serious
crimes but have not qualified as repeat offenders is
neither logical nor meaningful. (Ayon, supra, 46 Cal. App.
4th at p. 400.)

     Smart purports to apply the third prong of the Lynch
test by comparing his sentence to potential sentences for
recidivist indecent exposure in other jurisdictions. This
comparison fails, as a factual matter, because Smart's
Three Strikes sentence is not based solely on the fact
that he has been convicted of recidivist exposure. Smart's
prior strikes are for rape and felony burglary. In other
words, we firmly reject Smart's effort to portray himself
as nothing more than a harmless flasher.

     In considering the third prong of the Lynch test we
follow authority establishing that "a comparison of
California's punishment for recidivists with punishment
for recidivists in other states shows that many of the
statutory schemes provide for life imprisonment for repeat
offenders, and several states provide for life
imprisonment without possibility of parole. California's
scheme is part of a nationwide pattern of statutes calling
for severe punishments for recidivist offenders.
[Citation.]" (People v. Cline (1998) 60 Cal. App. 4th
1327, 1338; see also Gray, supra, 66 Cal. App. 4th at p.
993.)

     For all of these reasons, we hold that Smart has
failed to establish that his sentence violates either the
federal or state Constitutional prohibitions against cruel
and inhuman punishment.

  FN13.  Smart does not separately address his federal
constitutional claims but contends that the standard under
the federal constitution is substantially the same as the
California standard.

  FN14.  We note, simply by way of example, that the
exposure conviction in Lynch was based on proof that a
carhop waitress who had not been summoned approached
defendant's car and saw him fondling his penis through his
open fly while reading a pornographic magazine. (Lynch,

41

1
2
3

        _supra_, 8 Cal. 3rd at p. 438.)  The _Lynch_ defendant had a single prior exposure conviction.  The _Lynch_ defendant did not receive a three strikes sentence but, rather, a one year to life sentence pursuant to a statute that was no longer in effect when Smart was sentenced.

4

Opinion at 49-53 (footnotes in original).

5
6
7
8
9
10
11

    Petitioner cannot demonstrate that the California Court of Appeal's reasoned decision was contrary to, or involved an unreasonable application of, clearly established United States Supreme Court law.  Nor can he demonstrate that the state court's factual findings were unreasonable.  Petitioner can cite no clearly established law indicating that the state court decision was in error.

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

    Rather, the state court's reasoning is in accord with the applicable law.  Neither the Supreme Court nor the Ninth Circuit has held that California's three strikes laws violate the Eighth Amendment, and the Supreme Court has upheld sentences in habeas cases involving three strikes sentences.  _Lockyer v. Andrade_, 538 U.S. 63, 68 (2003); _Ewing v. California_, 538 U.S. 11, 19-20 (2003).  Indeed, in _Andrade_, the Supreme Court upheld the sentence of a California petitioner who was convicted on two counts of petty theft and sentenced to life in prison under the three strikes law, concluding it was not one of the "exceedingly rare" and "extreme" punishments that violates the Eighth Amendment.  538 U.S. at 73.  While the Eighth Amendment forbids sentences that are grossly disproportionate to the crime, a criminal defendant's history of recidivism is an important factor of the proportionality equation.  _Ewing_, 538 U.S. at 29 (confirming importance of a petitioner's "long history of felony recidivism" in an Eighth Amendment analysis).

28

"[T]he presence of violence on a petitioner's record seems an extremely important focal point for proportionality review." <u>Taylor v. Lewis</u>, 460 F.3d 1093, 1100 (9th Cir. 2006).

In this case, given the applicable law, Petitioner's record, and the nature of his prior criminal history -- recidivist exposure, rape, felony burglary -- the state court's conclusion that Petitioner's sentence was not unconstitutionally disproportionate to his crimes was not unreasonable.  Accordingly, Petitioner can show no Eighth Amendment violation and his claim must be denied.

CONCLUSION

For the foregoing reasons, the Petition for a writ of habeas corpus is DENIED.  Furthermore, for the reasons stated in this Order, a Certificate of Appealability is DENIED.  <u>See</u> Rule 11(a) of the Rules Governing Section 2254 Cases.  Petitioner may not appeal the denial of a Certificate of Appealability in this Court, but may seek a certificate from the Ninth Circuit under Rule 22 of the Federal Rules of Appellate Procedure.  <u>Id.</u>

The Clerk of Court shall terminate all pending motions as moot, enter Judgment in accordance with this Order and close the file.

IT IS SO ORDERED.

Dated: 10/7/2011

CLAUDIA WILKEN
United States District Judge

43

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

ALVIN SMART,

      Plaintiff,                         Case Number: CV09-03127 CW

  v.

                                    **CERTIFICATE OF SERVICE**

KELLY HARRINGTON et al,

      Defendant.

_____/

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on October 7, 2011, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Alvin  Smart F-17093

Sierra Conservation Center

5150 Obyrnes Ferry Rd.

Jamestown,  CA 95327

Dated: October 7, 2011

                              Richard W. Wieking, Clerk

                              By: Nikki Riley, Deputy Clerk

44